SIGNED this 8th day of March, 2013

_____
Marcia Phillips Parsons
UNITED STATES BANKRUPTCY JUDGE

_____

[This opinion is not intended for publication as the precedential effect is deemed limited.]

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re<br><br>　　WESLEY EVAN LEONARD,<br><br>　　　　　　　　Debtor. | No. 11-52028<br>Chapter 7 |
| AUTOMOTIVE FINANCE CORPORATION,<br><br>　　Plaintiff,<br><br>vs.<br><br>WESLEY EVAN LEONARD,<br><br>　　Defendant. | Adv. Pro. No. 11-5073 |

# **M E M O R A N D U M**

APPEARANCES:

Dudley Cheadle, Esq.　　　　　　　　Joseph B. Lyle, Esq.
2404 Crestmoor Road　　　　　　　　Post Office Box 274
Nashville, Tennessee 37215　　　　　　Bristol, Tennessee 37621
*Attorney for Plaintiff*　　　　　　　　*Attorney for Defendant*

**Marcia Phillips Parsons, Chief United States Bankruptcy Judge.** In this adversary proceeding, Automotive Finance Corporation ("AFC") seeks a determination of nondischargeability pursuant to 11 U.S.C. § 523(a)(6) arising out of the alleged conversion of its collateral by Wesley Evan Leonard ("Debtor"). Presently before the court is the Debtor's motion for summary judgment. Because genuine issues of material fact remain, the Debtor's motion will be denied. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(I).

I.

On August 31, 2011, the Debtor filed a voluntary petition for bankruptcy relief under chapter 7. Subsequently, on December 5, 2011, AFC timely commenced this adversary proceeding. In its complaint, AFC alleges that on October 9, 2006, the Debtor as member and manager of Leonard Motors, LLC ("Leonard Motors") executed a dealer application in order to obtain floor plan financing from AFC. On the same date, the Debtor also executed on behalf of Leonard Motors a "Demand Promissory Note and Security Agreement" ("Note"), which secured initial floor plan financing of $25,000, and granted AFC a security interest in substantially all of Leonard Motors' assets, including its inventory. In connection with the loan, the Debtor signed a personal guarantee. Thereafter, between January 10, 2007 and March 2, 2011, the amounts advanced under the Note were gradually increased to $300,000, with the Debtor executing on behalf of Leonard Motors a series of amendments to the Note in order to document the increases. Each additional increase was secured by the grant of a security interest in the Note and included in the Debtor's guarantee.

AFC also alleges in its complaint that under the terms of the Note, Leonard Motors was obligated to hold the proceeds from the sale of motor vehicles financed by AFC in trust for the benefit of AFC and to then pay these proceeds to AFC. According to AFC, notwithstanding this obligation, Leonard Motors sold nine particular vehicles[1] but failed to pay AFC the proceeds from the sales totaling $90,724.04. In its complaint, AFC seeks a determination that this amount, along with attorney fees, costs, and expenses, is excepted from the Debtor's bankruptcy discharge pursuant to 11 U.S.C. § 523(a)(2)(A) for fraud, § 523(a)(4) as a defalcation while acting in a fiduciary

---

[1] The vehicles include a 2007 Jeep Wrangler, 2003 Toyota 4Runner, 2004 Chevy Tahoe, 2004 Toyota Tacoma, 2004 Lexus ES330, 2004 Nissan Maxima, 2001 Chrysler Prowler, 2006 Honda Ridgeline, and 2004 BMW 3-series.

2

capacity and embezzlement, and § 523(a)(6) for willful and malicious injury to property. By order entered May 2, 2012, this court dismissed the § 523(a)(2)(A) and (4) counts of the complaint on the Debtor's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, but concluded that the complaint sufficiently stated a claim under § 523(a)(6).

On January 21, 2013, the Debtor filed the motion for summary judgment that is presently before the court. In the motion, the Debtor asserts that the undisputed material facts establish as a matter of law that he did not willfully and maliciously injure AFC or its property. The motion was accompanied by the Debtor's statement of undisputed material facts, which was supported by the Debtor's affidavit and Leonard Motors' bank statements from April 30 to September 30, 2011. In opposition to the Debtor's summary judgment motion, AFC filed a response to the Debtor's statement of undisputed material facts supported by an affidavit from Jerry Bosl ("Bosl"), a Senior Collections Manager with AFC, and audit reports of Leonard Motors' vehicle inventory performed on June 3, July 5 and July 16, 2011.

According to the Debtor's statement of undisputed material facts, of the nine vehicles referenced by AFC in its complaint, only one was actually financed with funds advanced by AFC. The remaining eight were purchased by Leonard Motors using its own funds, with AFC then advancing a portion of the purchase price to Leonard Motors in exchange for the surrender of the vehicle titles. According to the Debtor, upon the sale of a motor vehicle for which AFC had loaned funds after the fact, Leonard Motors had thirty days to pay AFC such that it would then release the vehicle title. While AFC does not deny the timing of when it actually advanced funds as to the eight vehicles, AFC does dispute that Leonard Motors had 30 days after a sale in which to forward payment to AFC. In support, AFC cites the Note which requires payment within 48 hours after a sale. Regardless of the contractual time for payment, AFC does not dispute the Debtor's statement that throughout the course of the parties' dealings Leonard Motors often sold vehicles to which AFC held the titles without remitting sale proceeds of the vehicles within 48 hours and would subsequently pay AFC as Leonard Motors' cash flow permitted, usually within 30 days.

The nine vehicles in question were sold by Leonard Motors between May 24 and July 23, 2011, the two months prior to Leonard Motors' closing of its doors on July 27, 2011. According to the Debtor, as each vehicle was sold in the ordinary course of Leonard Motors' business the

3

proceeds were deposited into its sole bank account for subsequent payment to AFC in accordance with the parties' prior course of dealing. The Debtor states that he had every intention of paying AFC, that he did not intend to harm or injure AFC, and believed that Leonard Motors would be able to pay AFC. He further states that he did not conceal or attempt to conceal from AFC the sale of financed vehicles, and that he did not divert or use any proceeds from the sales of financed vehicles for his own personal use.

In support of these assertions, the Debtor provides a detailed narrative describing when each of the nine vehicles was sold and when payments were subsequently made to AFC. In summary, on May 24, 2011, Leonard Motors sold the 2007 Jeep Wrangler, and between May 24 and June 7, 2011, made payments totaling $71,434.67 to AFC. On June 7, 2011, Leonard Motors sold the 2004 Nissan Maxima and 2004 Chevy Tahoe, and between June 7 and 27, 2011 made payments totaling $164,222.90 to AFC. On June 27, 2011, Leonard Motors sold the 2004 Toyota Tacoma, and between June 27 and July 12, 2011, made payments to AFC totaling $47,262.83. On July 12, 2011, Leonard Motors sold the 2004 BMW 3-series, and between July 12 and 14, 2011, made payments totaling $2,904.13 to AFC. On July 14, 2011, Leonard Motors sold a 2001 Chrysler Prowler and 2006 Honda Ridgeline, and between July 14 and 22, 2011 made payments to AFC totaling $31,429.14. On July 22 and 23, 2011, Leonard Motors sold, respectively, the 2004 Lexus ES330 and 2003 Toyota 4Runner, and on July 22, 2011, it made its last payment to AFC of $12,000.[2]

On July 27, 2011, the Debtor took Leonard Motors' remaining vehicle inventory to the East Tennessee Auto Auction, where the vehicles were sold and the proceeds directly remitted to AFC. The Debtor asserts that he took this action after his wife was diagnosed with cancer in late July 2011, and thereafter concluding that Leonard Motors' financial condition could not be salvaged.

The Debtor states that when he returned from the auction to Leonard Motors' business location, agents from the Tennessee Department of Revenue ("TDR") were on site and informed him that the business was being closed. That same day, TDR also garnished Leonard Motors bank

---

[2] In addition to the payments described in the body of this memorandum, two checks were returned for insufficient funds, the first dated July 18, 2011, and the second dated July 28, 2011. The parties dispute whether these blank but signed checks in AFC's possession were completed with Leonard's knowledge and consent.

4

account for $6,986 for past due taxes. According to the Debtor, Leonard Motors owed substantially more in past due taxes at the time of the garnishment, but only $6,986 remained in Leonard Motors' bank account at the time. TDR's garnishment was preceded by the Debtor's payment of $9,506 to TDR for past due taxes on June 28, 2011.

The Debtor argues that the foregoing facts demonstrate as a matter of law that any conversion of collateral was neither wilful nor malicious. In response, AFC does not challenge the Debtor's description of vehicle sales or payments to AFC between May 24 and July 22, 2011. However, AFC disputes the Debtor's statements that he did not use any of the sale proceeds for his own personal use, and that he never attempted to conceal from AFC the sale of financed vehicles. Regarding the former, AFC points to Leonard Motors' bank statements which appear to evidence a June 22, 2011 payment of $5,328.93 to HSBC for payment on the Debtor's personal credit card and a July 26, 2011 payment of $2,000 to the Debtor the day before Leonard Motors closed. As to alleged attempts to conceal vehicle sales, AFC asserts that the Debtor and his wife concealed the prior sales of four vehicles during inventory audits performed by AFC on June 3, July 5 and July 16, 2011, as evidenced in the audit reports attached to Mr. Bosl's affidavit. Specifically, according to these reports, the Debtor advised the AFC auditor during the first two audits that the 2007 Jeep Wrangler had not been sold and that it was located at Lowe's Paint and Body Shop even though according to the Debtor's affidavit herein this vehicle was sold on May 24, 2011, before the audits. The July 5, 2011 audit report indicates that the Debtor informed the auditor that the 2004 Nissan Maxima and 2004 Toyota Tacoma had not been sold, which statement is contrary to the Debtor's affidavit in this case which states that the vehicles were sold on June 7 and 27, 2011, respectively. The July 5, 2011 audit report also recites that the Debtor's wife advised the auditor that the 2004 Chevrolet Tahoe had not been sold and was being used as a demo even though the Debtor's affidavit states that the vehicle was sold on June 7, 2011. Lastly, the July 16, 2011 audit report continues to list these four vehicles as unsold, which, according to AFC, demonstrates that the Debtor continued to conceal the sale of these vehicles. Based on all of the foregoing, AFC argues that a material issue of fact exists regarding whether the Debtor willfully and maliciously injured AFC for purposes of §523(a)(6).

5

II.

Federal Rule of Civil Procedure 56(a)[3] provides that "[a] party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought" and that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The initial burden to demonstrate the absence of a genuine dispute of material fact rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 , 323, 106 S. Ct. 2548 (1986). Upon making such a showing, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine dispute of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986). Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In the alternative, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).[4]

---

[3] Federal Rule of Bankruptcy Procedure 7056 incorporates Rule 56 for adversary proceedings.

[4] While Rule 56(c)(1) "addresses the ways to support an assertion that a fact can or cannot be genuinely disputed[,] [i]t does not address the form for providing the required support." Fed. R. Civ. P. 56(c)(1) (2010 advisory committee comments). As to form, Rule 7056-1 of this court's local rules works in tandem with Rule 56(c) by requiring that every motion for summary judgment "be accompanied by a statement of material facts which the movant contends are undisputed . . . [,] supported by specific citation to material allowed by Fed. R. Civ. P. 56(c) that establishes the fact." *See* E.D. Tenn. LBR 7056-1(a). The nonmovant must respond to the movant's statement by "(1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of summary judgment only; or (3) stating that the fact is disputed as demonstrated by specific citation to material allowed by Fed. R. Civ. P. 56(c)." E.D. Tenn. LBR 7056-1(b). A respondent may also file "a statement of additional material facts that the respondent contends are undisputed and require the denial of the motion," which statement must be supported by and responded to in the same manner as the original statement. E.D. Tenn. LBR 7056-1(c).

When deciding a motion for summary judgment, the court may not weigh the evidence to determine the truth of the matter asserted by but simply determines whether a genuine dispute for trial exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505 (1986). The facts and all resulting inferences are viewed in a light most favorable to the nonmovant, and the court decides whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Summary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or interferences by the trier of fact." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553, 119 S. Ct. 1545 (1999)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

### III.

Pursuant to § 523(a)(6), a debt is nondischargeable when it is the result of "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). As stated by the Sixth Circuit, "the judgment must be for an injury that is both willful and malicious. The absence of one creates a dischargeable debt." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999).

The Supreme Court has defined "willfulness" for purposes of § 523(a)(6). *See Kawaauhau v. Geiger*, 523 U.S. 57, 118 S. Ct. 974 (1998). Specifically, the Supreme Court has stated that "nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Geiger*, 523 U.S. at 61. After *Geiger*, the Sixth Circuit concluded "that unless 'the actor desires to cause the consequences of his act, or believes that the consequences are substantially certain to result from it,' he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." *In re Markowitz*, 190 F.3d at 464 (citations omitted).

In contrast, "'[m]alicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986) (citations omitted). Stated differently, "[t]here must also be a

7

consciousness of wrongdoing. . . . It is this knowledge of wrongdoing, not the wrongfulness of the debtor's actions, that is the key to malicious under § 523(a)(6)." *ABF, Inc. v. Russell (In re Russell)*, 262 B.R. 449, 455 (Bankr. N.D. Ind. 2001) (citations omitted). A party may establish malice for purposes of § 523(a)(6) by showing "that (1) the debtor has committed a wrongful act, (2) the debtor undertook the act intentionally, (3) the act necessarily causes injury, and (4) there is no just cause or excuse for the action." *JP Morgan Chase Bank, NA v. Algire (In re Algire)*, 430 B.R. 817, 823 (Bankr. S.D. Ohio 2010) (citing *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228 (6th Cir. 1991); *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202 (9th Cir. 2001)).

It is well settled that conversion of a secured creditor's collateral may constitute willful and malicious injury under § 523(a)(6).[5] *See, e.g.*, *Dealer Servs. Corp. v. Erb (In re Erb)*, 453 B.R. 914, 920 (Bankr. W.D. Wis. 2011); *Automotive Fin. Corp. v. Rigoroso (In re Rigoroso)*, 453 B.R. 612, 615-16 (Bankr. D.S.C. 2011); *CMEA Title Agency, Inc. v. Little (In re Little)*, 335 B.R. 376, 386-87 (Bankr. N.D. Ohio 2005); *In re Jenkins*, 330 B.R. 625, 630 (Bankr. E.D. Tenn. 2005). However, not every conversion will constitute a willful and malicious injury for purposes of § 523(a)(6). As stated by the Supreme Court:

> [A] willful and malicious injury does not follow from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.

*Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332, 55 S. Ct. 151 (1934) (citations omitted).

The evidence tendered by the Debtor in support of his summary judgment motion suggests that he did not intend to injure AFC, nor did he believe that harm was substantially certain to result from nonpayment, such that the wilful component of § 523(a)(6) would not be satisfied. Under the Debtor's version of the facts, AFC would have been paid in the ordinary course of Leonard Motors' business from the company's cash flow as it had often been in the past. Similarly, this evidence

---

[5] Under Tennessee law, "[c]onversion is 'the appropriation of property to the party's own use and benefit, by the exercise of dominion over it, in defiance of the plaintiff's right." *Brandt v. Bib Enters., Ltd.*, 986 S.W.2d 586, 595 (Tenn. App. 1998) (quoting *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. App. 1977)).

suggests the absence of malice, since the Debtor would have no knowledge of wrongdoing with respect to Leonard Motors' failure to pay over the specific sale proceeds from the sale of each vehicle at the time of sale. Because payment in the past out of subsequent cash flow had been satisfactory to AFC, it would have been logical for the Debtor to continue to believe that payment in this fashion in the future would be satisfactory.

The evidence tendered by AFC, however, contradicts the Debtor's statements of intent and knowledge and consequently the conclusions drawn therefrom. The misstatements in the audit reports attributable to the Debtor and/or his wife suggest that the Debtor was concealing the prior sales of vehicles because he knew that the sale of vehicles without paying the sale proceeds to AFC was wrongful. This evidence of knowledge of wrongdoing, i.e., malice, creates a genuine issue of material fact as to whether the conversion of AFC's proceeds was malicious. Similarly, the Debtor's payment of a substantial personal credit card bill with Leonard Motors' funds only five weeks before the business closed, and a $2,000 payment to himself the day before the closing casts doubt upon the Debtor's assertions that he did not intend to harm AFC and that harm was not substantially certain to result from the failure to forward the proceeds from each vehicle sale to AFC. Moreover, the proximity of the sale of four financed vehicles between July 12 and 23, 2011, to the Debtor's decision to close Leonard Motors in late July 2011 calls into question the Debtor's statement that he believed that AFC would be paid in full from future sales. Thus, a genuine dispute of material fact exists as to whether the conversion was willful. While the Debtor attributed the closure decision to his wife's presumably unexpected cancer diagnosis, viewing the evidence in its entirety and in a light most favorable to AFC, *see Anderson*, 477 U.S. at 251-52, the court is unable to conclude that the evidence is so one-sided in the Debtor's favor that he must prevail as a matter of law. Accordingly, the Debtor's motion for summary judgment must be denied. An order to this effect will be entered by the court.

# # #